UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | |
| Plaintiff, | Crim. No. 13-15 (1) (DWF/LIB) |
| v. | **REPORT AND RECOMMENDATION** |
| Cody Lowell Troy, | |
| Defendant. | |

This matter came before the undersigned United States Magistrate Judge upon Defendant's motion to suppress evidence obtained as a result of the search and seizure of evidence at the apartment where Defendant was staying at the time of the search. The case has been referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on February 25, 2013, regarding the suppression motion and both parties' discovery motions in this case.[1] Upon the parties' request, the Court permitted Defendant and the Government to submit written memorandums in support of their respective positions regarding Defendant's motion to suppress. Having considered the arguments of both parties and the evidence in the record, the Court now recommends that Defendant's motion to suppress be denied.

## I.    BACKGROUND

At the hearing on Defendant's motion, two witnesses testified for the Government: Minnesota Bureau of Criminal Apprehension Special Agent Donald Newhouse (SA Newhouse) and Federal Bureau of Investigation Special Agent Matthew A. Zavala (SA Zavala). One

---

[1] The discovery motions were the subject of a separate order.

witness testified for the Defendant:  Mr. Joseph Johnsrud, a friend and roommate of Defendant.

Unless otherwise noted, the facts below are based on the testimony of those witnesses.

### A.  Events leading up to the search of the Bemidji Avenue apartment

SA Newhouse and SA Zavalla both testified that on December 10, 2012, they responded

to the First State Bank of Big Fork, in Kelliher, Minnesota, upon a report of an armed bank

robbery.  (Motions Hearing Tr. 18, 151, Feb. 25, 2013 [Docket No. 50]).  After arriving at the

scene, SA Newhouse reviewed the security video camera footage from both inside and outside

the bank and observed an individual wearing a white Tyvek protective suit, a white or light-

colored Halloween, "Michael Myers," type mask, and carrying a blackbag approach the front

door of the bank on foot.  (Tr. 18-19).  Upon entering the bank, the individual proceeded to a

bank teller, placed the black bag on the counter, and pointed a firearm at the teller.  (Tr. 19).  The

teller removed what was later verified to be approximately $3,700 from her bank drawer and put

it into the black bag.  (Tr. 19).  The individual then exited the bank and left in the same direction

from which he entered.  (Tr. 19).  SA Newhouse also interviewed the teller.  (Tr. 20).  She

provided the same facts described above and further stated that when the individual pointed the

firearm at her, he "worked the action of the firearm."  (Tr. 20).

Outside of the bank, law enforcement found shoeprints, having two different styles of

zig-zag patterns and a Nike Air Jordan symbol located in the tread pattern, as well as, vehicle

tracks in the snow that they believed were from the vehicle the suspect entered after robbing the

bank.  (Tr. 20-21).  Both the shoeprints and the vehicle track treads were photographed by law

enforcement.  (Tr. 21).  Furthermore, later on the day of the robbery, a witness approached a

deputy and stated that he had observed a maroon Ford Ranger "parked about a block away from

the bank, which was in the vicinity of where the tire tracks were found and the shoeprints led to and from." (Tr. 152).

The following day, on December 11, 2012, law enforcement received a tip from a witness who stated she had seen a smaller, red pickup truck travelling away from the city of Kelliher at a high rate of speed on the same road to which the police had tracked the vehicle tire tracks (County Road 36) on the day of the robbery. (Tr. 21-22). The witness further indicated that she believed the driver of the vehicle was one of the Burns family male children from Kelliher, Minnesota. (Tr. 22).

Also on December 11, 2012, law enforcement received a call from a witness who purported to be a prior foster care provider to Defendant. (Tr. 23). This caller informed law enforcement that he was concerned that Defendant might have been involved in the Kelliher bank robbery because he knew Defendant "had previously possessed a Michael Myers mask, . . . and had previously worn the mask in an attempt to either scare people or freak people out." (Tr. 23). The caller believed that Defendant had access to Tyvek-type protective clothing because Defendant's stepfather was involved in the construction trade. (Tr. 23). Finally, the caller informed law enforcement that Defendant had a criminal history, which included recent crimes related to burglary. (Tr. 23).

Law enforcement then checked Defendant's criminal history and confirmed that he had been arrested and convicted for crimes related to burglary. (Tr. 24). They also discovered that there was an active arrest warrant for Defendant issued by Itasca County and decided to attempt to locate Defendant. (Tr. 24). After speaking with known associates of Defendant, law enforcement learned that Defendant might be residing or staying with Co-Defendant, Travis

Burns, at an apartment above a photography business located at 1305 Bemidji Avenue (hereafter Bemidji Avenue apartment).  (Tr. 24).

### B.  The search of the Bemidji Avenue apartment

On the morning of December 12, 2012, SA Newhouse, SA Zavala, Beltrami County Sheriff's Department Investigator Hodapp, and several other law enforcement officers, met to discuss their plan for arresting Defendant Troy.  (Tr. 45-46).  Shortly after the meeting, SA Newhouse, Investigator Hodapp, and two other uniformed officers set out for the Bemidji Avenue apartment and arrived there shortly before 11:00 a.m. (Tr. 25).  Immediately upon arriving, the officers observed a red Mazda pickup truck parked in the alley, which, after a registration check, they determined to be registered to a Michael Burns of Kelliher, whom they believed to be the father of Co-Defendant Travis Burns.  (Tr. 25).  The officers also looked at the tread pattern of the Mazda pickup truck's tires and observed the tread to be similar to the tread pattern of the vehicle tracks previously observed leading away from the scene of the bank robbery.  (Tr. 26).

Before heading to the apartment, one of the officers confirmed with the photography business owner, who was the landlord for the upstairs apartment, that Co-Defendant Travis Burns was one of the occupants.  (Tr. 26).  After this confirmation, led by SA Newhouse, the officers headed up to the apartment above the photography studio via the only means of access: a spiral staircase from the alley to the roof area and a catwalk, with a fence on both sides, from the top of the roof to a door leading into the apartment.  (Tr. 26).

As SA Newhouse approached the apartment, he observed some movement inside the apartment, which he believed to be an individual moving from right to left.  (Tr. 27).  Although SA Newhouse had concerns about officer safety at this point, he did not draw his firearm.  (Tr.

49).  The officers then knocked on the door, and Defendant immediately came to the door, at which time he was placed under arrest.  (Tr. 27).  During the arrest, and upon inquiry, Defendant stated that there was someone else still in the apartment.  (Tr. 27-28).

SA Newhouse and Mr. Johnsrud gave varying accounts as to what happened next.  SA Newhouse testified that he immediately pushed open the door to the apartment that had been closed by Defendant and began calling out to anyone else in the apartment.  (Tr. 28).  He testified that, because of officer safety concerns, he was interested in keeping the apartment door open and making contact with anyone that was inside the apartment, such as Co-Defendant Travis Burns, whom SA Newhouse believed was likely to be inside, given that a sawed-off shotgun had been reported to be used during the crime.  (Tr. 28).

SA Newhouse testified that after he called into the apartment, he heard a response back from someone inside.  (Tr. 28).  SA Newhouse asked the individual to come out, and after a few seconds, an individual appeared in the living room of the apartment, approximately 20 feet away from SA Newhouse.  (Tr. 28-29).  The individual identified himself as Joseph Johnsrud, and he explained that he was a roommate of Co-Defendant Travis Burns.  (Tr. 29).  Mr. Johnsrud further stated that he was a childhood friend of both Defendant Troy and Co-Defendant Travis Burns.  (Tr. 29).  He provided that Defendant Troy was not a roommate but that Defendant Troy had been staying there recently.  (Tr. 29, 79).

The officers then identified themselves as law enforcement, informed Mr. Johnsrud that there was a warrant for Defendant Troy's arrest, that Defendant Troy was being arrested, that they were investigating the Kelliher bank robbery that had occurred earlier in the week, and asked to enter the apartment to further talk with Mr. Johnsrud.  (Tr. 30).  SA Newhouse was the first to enter the apartment, and he asked Mr. Johnsrud whether there was anyone else in the

apartment or whether there were any firearms in the apartment. (Tr. 30). Mr. Johnsrud provided

that he had just woken up and could not be sure but did not believe that there was anyone else or

any weapons in the apartment. (Tr. 30). Mr. Johnsrud then asked to be permitted to put on some

additional clothing, as he had initially come out in shorts, and SA Newhouse followed him to his

bedroom, where Mr. Johnsrud changed. (Tr. 31). While Mr. Johnsrud was changing, the

remaining officers performed a protective sweep of the apartment "to make sure that there [were]

no other occupants in the apartment that might be able to cause harm to [the officers]." (Tr. 31).

During this protective sweep, officers observed drug paraphernalia items in plain view and

smelled marijuana. (Tr. 31-32). Because of the drug paraphernalia and marijuana smell, SA

Newhouse asked Mr. Johnsrud if he would consent to a search of the areas in the apartment that

Mr. Johnsrud controlled, such as Mr. Johnsrud's bedroom and any other common areas. (Tr.

32). SA Newhouse informed him that he had a right to refuse and that SA Newhouse could seek

a search warrant before doing any further searching in the apartment. (Tr. 32). Mr. Johnsrud

indicated that he understood the request and agreed to permit officers to search his bedroom and

the common areas of the apartment. (Tr. 32).

     The officers' search of Mr. Johnsrud's bedroom revealed nothing relevant to the present

motion. (Tr. 33). The officers also searched the kitchen area of the apartment and a door-less,

open closet area off of the kitchen (hereafter "kitchen closet"). (Tr. 33). Mr. Johnsrud indicated

to the officers that he owned some of the items stored in the closet, such as some electronic

equipment, boxes, and cooler but also explained to the officers that some of the property in the

closet did not belong to him. (Tr. 33, 60, 63). During the search of the closet area, while Mr.

Johnsrud was near, SA Newhouse observed that there was a partial box of shotgun shells in a

laundry basket. (Tr. 33-34). SA Newhouse immediately asked Mr. Johnsrud who owned the

laundry basket, to which Mr. Johnsrud answered Defendant Troy.  (Tr. 34).  SA Newhouse then

exited the apartment with the intent to speak with Defendant Troy and attempt to obtain his

consent to search the rest of the apartment, but he learned that Defendant Troy had already been

transported to the Beltrami County Jail.  (Tr. 35).

　　Mr. Johnsrud's testimony at the hearing differed somewhat from SA Newhouse's

testimony.  Mr. Johnsrud testified that he first woke up on the morning of December 12, 2012, at

approximately 9:30 a.m.,[2] when Defendant Troy, not having a key to the apartment, began

pounding on the outside, front door to be let in.  (Tr. 79-80).  After opening the front door for

Defendant Troy, Mr. Johnsrud went back to bed and fell back asleep.  (Tr. 80-81).  The next

thing Mr. Johnsrud remembers is being woken up in his bed by a police officer in a brown

uniform asking to talk to him.  (Tr. 82).  Mr. Johnsrud also observed an officer wearing a black

coat poking his head through the doorway into the room.  (Tr. 82).  Mr. Johnsrud testified, that

prior to being woken up, he did not know that any officers had entered the apartment.  (Tr. 84).

He testified at the hearing that he was sure he was woken up by law enforcement, and had "no

doubt about [the fact] that [he] was laying in [his] bed when [he] was woken up."  (Tr. 87).

　　Mr. Johnsrud testified that after getting dressed, he joined the officers in the living room,

where they asked him if there was any marijuana in the house.  (Tr. 84).  He responded that there

was but that it was not his.  (Tr. 84-85).  Law enforcement then asked if they could search his

room and he answered, "Go ahead. You know, I got nothing. You can go ahead and do whatever

you need to do."  (Tr. 85).  Law enforcement also asked him if they could search the apartment,

to which Mr. Johnsrud explained that he could not give them permission to search things that did

---

[2] On cross-examination, Mr. Johnsrud testified that he "remember[ed] looking at [his] clock when [he] woke up,
because [he] heard the pounding, and [his] cell phone [was] laying right by [his] head."  (Tr. 88-89).  When asked if
he ever told law enforcement before his testimony at the hearing as to what time he was woken up by Defendant
Troy, Mr. Johnsrud testified that he didn't "really know the exact timeline," but that "[i]t was somewhere between
9:30 and 10:30."  (Tr. 89).

not belong to him but that they could "check [his] stuff." (Tr. 85). Specifically, when asked if

they could search in the kitchen closet, Mr. Johnsrud provided that he owned some of the "stuff"

stored in the closet but that others also owned certain items in the closet and that he "couldn't"

give them permission to search the closet. (Tr. 86). On cross-examination, however, he clarified

that he "couldn't" give permission for them to search the closet because he didn't "have control

of all the stuff in that closet [and] [could not] give [them] full consent," though he was able to

identify which objects in the closet were his. (Tr. 96). He also testified that he never objected to

the search of any of the items in the closet while the search was ongoing. (Tr. 96). He further

testified that when law enforcement asked him for permission to search the parts of the

apartment under his control, he gave them permission to do so, "willingly handed [his] phone

over too," and "once [he] found out the reason why they were there, [he] tried to just get out of

their way." (Tr. 95).

Before departing, SA Newhouse "froze" the Bemidji Avenue apartment by leaving law

enforcement officers there to ensure that it would remain secure and no evidence would be

damaged, moved, changed, or destroyed. (Tr. 35, 69). SA Newhouse testified at the hearing that

Mr. Johnsrud's demeanor, throughout the search and discussions with officers, was cooperative

and understanding. (Tr. 34). SA Zavalla likewise testified that Mr. Johnsrud was cooperative

throughout the investigation and "seemed ready to answer questions and engage in

conversation." (Tr. 68). At no time did Mr. Johnsrud voice any objection to any of the searching

in the apartment or any of the questioning. (Tr. 34). He did, however, inform the officers that he

wouldn't be able to give permission for law enforcement to search Co-Defendant Travis Burns'

bedroom. (Tr. 34).

After "freezing" the Bemidji Avenue apartment, SA Newhouse, accompanied by SA Zavalla, travelled to the Beltrami County Jail to talk with Defendant Troy.  (Tr. 35).  During the recorded interview, and after being given his <u>Miranda</u> rights warning, Defendant Troy provided that he was currently staying at the Bemidji Avenue apartment and that he was storing some things there.  (<u>see</u> Gov't Ex. 1 and 2).  Defendant explained to the officers that he could only provide consent to search his personal belongings he had stored at the Bemidji Avenue apartment, including a keyboard, microphone, microphone stand, monitor, snowboard, boots and further admitted that he owned white clothing baskets located in a closet near the kitchen.  (<u>Id.</u>)

Based upon all of the information law enforcement had thus far, Investigator Jake Hodapp applied for a search warrant for the Bemidji Avenue apartment.  (Tr. 37); (Gov't Ex. 9). After the issuance of the search warrant, law enforcement officers returned to the Bemidji Avenue apartment to execute the warrant.  (Tr. 42, 71).  During this search, in the kitchen closet, officers uncovered and seized the following items: a portion of a shotgun barrel that had been sawed off along with a stock for a firearm that had been sawed off, a bag containing a Michael Myers type Halloween mask, a white Tyvek suit, a pair of Gorilla Grip gloves, a pair of Air Jordan tennis shoes with a similar shoeprint pattern as that observed at the scene of the Kelliher bank robbery, a sawed-off Mossberg shotgun, a box containing wigs and/or other Halloween masks, a hacksaw, some court documentation for Defendant Troy, and the partial box of shotgun ammunition in the laundry basket previously observed in the closet.  (Tr. 42, 71).  Officers also found and recovered, from Co-Defendant Burns's bedroom, U.S. currency and a duffle bag that matched the appearance of the backpack seen in the surveillance footage from the Kelliher bank robbery.  (Tr. 42-43, 71).  The recovered currency included some "bait money" that the teller had placed in the robber's bag, namely, a one-dollar bill with the exact serial numbers of a

prerecorded dollar bill that was reported stolen by the Kelliher Bank on December 10, 2012.  (Tr. 43).  During the search executing the warrant, Mr. Johnsrud advised the officers that Co-Defendant Burns had then attempted to communicate with him in an attempt to ascertain whether the police were inside the apartment.  (Tr. 43).  It was at that time that law enforcement learned that Co-Defendant Burns might be staying at his girlfriend's apartment and left to arrest him.  (Tr. 44).

## II.    DISCUSSION

Defendant seeks to suppress all evidence obtained as a result of the initial warrantless search of the Bemidji Avenue apartment as well as any evidence obtained from the second search of the same apartment pursuant to the search warrant.  (Mem. in Supp. of Mot. to Suppress [Docket No. 52] at 1).  Defendant argues that the initial warrantless search does not fall within any exception to the warrant requirement and the second search pursuant to the search warrant was tainted as poisoned fruit of the initial warrantless search.  (Id. at 7).

The Government argues that law enforcement took several lawful steps resulting in the initial search of the Bemidji Avenue apartment, none of which violated Defendant's Fourth Amendment rights.  (Gov't's Br. In Resp. [Docket No. 53] at 13).  Specifically, the Government argues that the initial entry into the Bemidji Avenue apartment, regardless of whether SA Newhouse or Mr. Johnsrud's testimony is to be believed, was done to conduct a protective sweep of the apartment; that the limited search of the door-less kitchen closet area was done pursuant to the consent of Mr. Johnsrud; and that the subsequent search warrant is supported by probable cause, even if the evidence found in the Bemidji Avenue apartment prior to the application of the search warrant were not to be considered.  (Id.)  For the reasons that follow, the Court agrees.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV.[3] "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). "The government bears the burden of establishing that an exception to the warrant requirement applies." United States v. Williams, 616 F.3d 760, 765 (8th Cir. 2010).

### A. Law enforcement lawfully entered the Bemidji Avenue apartment to conduct a protective sweep

"While in general, an arrest does not justify a full-blown search of the arrestee's home . . . the Supreme Court has held that officers may conduct a limited protective sweep following an in-home arrest if they have a 'reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" United States v. Gallegos, 430 F. Supp.2d 915, 925-26 (D. Minn. 2006). In other words, a protective sweep of a home requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494

---

[3] To challenge the lawfulness of a search under the Fourth Amendment, a defendant must first demonstrate that he had a reasonable expectation of privacy. Rakas v. Illinois, 439 U.S. 128, 143 (1978) ("[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."). The Government does not dispute that Defendant Troy had an expectation of privacy in the Bemidji Avenue apartment. While it appears from the record that Defendant Troy was not part of any formal roommate agreement, it is undisputed that he had been staying at the apartment for several days and stored personal belongings in various areas of the apartment. Thus, the Court finds that Defendant Troy had a reasonable expectation of privacy in the apartment. Minnesota v. Olson, 495 U.S 91, 96-97 (1990); United States v. Nabors, 761 F.2d 465, 469 (8th Cir. 1985); United States v. Lindsey, No. 10-cr-15 (JNE/JJK), 2010 WL 4833939, at *20 (D. Minn. Jul 20, 2010); United States v. Pollard, 215 F.3d 643, 647 (6th Cir. 2000) (finding that the defendant had a reasonable expectation of privacy because he had known the lessee for many years, stayed at the apartment earlier in the week, and kept some personal belongings in a closet).

U.S. 325, 334 (1990). The basis for allowing officers to conduct a protective sweep in these circumstances comes from the "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." Id. at 333 (emphasis added); United States v. Cash, 378 F.3d 745, 747-48 (8th Cir. 2004). At least part of the reason for justifying a protective sweep comes from the fact that "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Buie, 494 U.S. at 333.

Defendant correctly acknowledges that law enforcement may perform a protective sweep of a residence, even when an arrest takes place outside the residence. (Mem. in Supp. of Mot. to Suppress at 9) ("[A] protective sweep involving an arrest outside a home, like Mr. Troy's arrest, requires a specific, reasonable basis for believing there is a danger from a person inside the residence."); see also United States v. Arch, 7 F.3d 1300, 1303-04 (7th Cir. 1993) (explaining that courts have found a protective sweep lawful even "when an arrest is made just outside the home . . . on the theory that the officers are as much at risk from an unexpected assault on the defendant's doorstep as they might be inside the home" and collecting cases from numerous circuits so holding); United States v. Hoyos, 892 F.2d 1387, 1397 (9th Cir. 1989) ("[The defendant's] contention that the protective sweep exception to the requirement of a search warrant to enter a residence does not apply if the arrest occurs *outside* is not supported by any authority. This is not surprising because the distinction is logically unsound. If the exigencies to support a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another."),

12

overruled on other grounds by <u>United States v. Ruiz</u>, 257 F.3d 1030 (9th Cir. 2001); <u>United States v. Lawlor</u>, 406 F.3d 37, 41 (1st Cir. 2005) ("We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene."); <u>United States v. Cavely</u>, 318 F.3d 987, 995-96 (10th Cir. 2003) (holding that officers could enter a residence to conduct a protective sweep, even though the defendant was arrested on the driveway outside of the residence, when the defendant had informed the officers there was a "friend" still inside, officers had information that led them to believe a firearm could be in the house, and the officers were in a location vulnerable to an attack from someone inside); <u>Dodson v. Fitzhugh</u>, 2006 WL 1646189, at *5-6 (E.D. Ark. Jun. 12, 2006) (explaining that "[w]hile *Buie* did not specifically address whether officers who made an arrest outside a home would be justified in entering the residence without a warrant to conduct a protective sweep, the justification for allowing police officers to conduct such sweeps is equally compelling" and that "[a] number of circuits [that] have specifically addressed this issue and have permitted protective sweeps following an arrest made just outside the home"). Defendant argues, however, that in this case there was no specific and reasonable basis for the officers to believe there was a danger from a person inside the residence. (Mem. in Supp. of Mot. to Suppress at 9).[4] The Court disagrees.

---

[4] After each party had submitted its written memorandum in support of its respective position, and after the Court had taken the matter under advisement, (see Minute Entry [Docket No. 46]), Defendant improperly, and without permission from the Court, filed a reply to the Government's submission. (See Def.'s Reply [Docket No. 56]). While it would be within the Court's discretion to disregard this filing, even if the Court were to consider it, it offers no reason to depart from the Court's analysis. In the reply, Defendant argued that <u>Buie</u> does not "authorize a warrantless enter [sic] into a home to conduct a search <u>after</u> an arrest has been executed <u>outside</u> a home." (See <u>id.</u> at 1-2) (emphasis in original). Defendant provided no authority whatsoever for this proposition. Defendant appears to

Here, law enforcement entered the Bemidji Avenue apartment only after they learned from Defendant Troy, a suspect in an armed bank robbery, that there was someone else still inside the apartment, and given the information at the time of Defendant's arrest, particularly being aware that a firearm had been used in the robbery, a reasonably prudent law enforcement officer could have believed that the area to be swept harbored an individual posing a danger to those on the arrest scene.

While Defendant argues that "officers did not observe any other individuals inside the residence," (id. at 10), they did not need to before performing the protective sweep.  The mere fact that police did not directly see anyone immediately inside the home does not eliminate the very real possibility that there was someone else inside; especially since Defendant, who had just exited the apartment, specifically informed the officers that there was another individual still inside the apartment.  Furthermore, until conducting the protective sweep officers could not be assured that the individual still in the apartment was not Co-Defendant Burns about whom law enforcement had information to suggest may have been involved in the armed bank robbery: they had received a report from a witness that one of the Burns family male children was seen leaving Kelliher at a high rate of speed in a small, red pick-up truck near the time of the robbery, and prior to coming up the staircase, the officers had observed a small, red pick-up truck (with a similar tire tread pattern as that observed at the scene of the bank robbery) parked near the Bemidji Avenue apartment and the truck was registered to Co-Defendant Burns' father.  Indeed, the owner of the business below the apartment had earlier confirmed that Co-Defendant Burns

---

rely on Vale v. Louisiana, 399 U.S. 30, 33-34 (1970) for the proposition that "if a search of a house is to be upheld as an incident to an arrest, that arrest must take place inside the house."  (See id. at 1) (quoting Vale, 399 U.S. at 33-34).  While Vale held as such, it is inapplicable here.  Vale dealt with a **search** inside a home after an arrest that took place outside of the home—not a **protective sweep** immediately after an arrest on the residence doorsteps and where there was reason to believe there was a danger to the officers from a person inside the residence, and therefore, it included no discussion of Buie.  The Government has not sought to justify any **search** of the apartment based on Buie but, rather, has argued that police were authorized to merely enter the apartment to perform a protective sweep for their safety.

was an occupant of the rental apartment.  See United States v. Williams, 577 F.3d 878, 880 (8th Cir. 2009) (rejecting the defendant's argument that a protective sweep was pretextual because police had observed the only occupants of the home and explaining that "[w]hile hindsight reveals that the officers had already encountered all of the occupants of the home before conducting the protective sweep, that information was not apparent to the officers when they initiated the sweep"); Hoyos, 892 F.2d at 1397 ("We must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger."  (internal quotation marks omitted)).

As already noted, the officers were also well aware that a firearm had been used in the commission of the bank robbery a mere two days before the search and the officers had received two independent witness reports that led them to suspect both Defendant Troy and Co-Defendant Burns may have been involved in the robbery.  Given that law enforcement had received specific information from someone who had just exited the apartment that there was another individual still inside, that law enforcement had good reason to believe the individual could possibly be someone that was suspected to be present during the armed bank robbery, and that a firearm had been used during the commission of the crime, the officers had "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  See United States v. Davis, 471 F.3d 938, 944-45 (8th Cir. 2006) (finding a protective sweep reasonable where officers had articulable facts that other persons may be in the barn and that firearms may be in the barn); United States v. Burrows, 48 F.3d 1011, 1017 (7th Cir. 1995) (finding a protective sweep lawful where officers suspected one of the individuals inside had been involved in committing a crime involving a firearm and upon arriving officers saw

15

movement inside the home); <u>United States v. Thomas</u>, 249 F.3d 725, 729 (8th Cir. 2001) (finding that police could perform a protective sweep of a van incident to an arrest when police had reasonable suspicion to believe that the driver had committed an armed bank robbery).

Nor does the fact that Defendant Troy was placed under arrest immediately before the protective sweep was performed undermine the ability of the officers to make a protective sweep of the apartment.  See <u>Williams</u>, 577 F.3d at 882 ("Although [the defendant] was handcuffed before the search occurred, a valid protective sweep may be conducted within a reasonable period of time after the subject of the warrant has been arrested"); <u>Davis</u>, 471 F.3d at 944 ("A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers."); <u>Burrows</u>, 48 F.3d at 1017 n.9 (explaining that "the particular facts associated with an arrest may necessitate that officers conduct a protective sweep before they can safely depart the premises" and citing numerous cases so holding).[5]

Therefore, the officers could and did lawfully enter the Bemidji Avenue apartment to conduct a protective sweep in order to assure themselves that there was no immediate danger to them from any other persons that could be hiding inside.  Because the Court finds that law enforcement had authority to enter the apartment for this limited purpose, the matter of the varying testimony between SA Newhouse and Mr. Johnsrud regarding how the police first made

---

[5] Although the scope of a protective sweep is indeed limited to "a cursory inspection of those spaces where a person may be found," <u>Buie</u>, 494 U.S. at 335, there is nothing in the present record to indicate that officers went beyond this limited scope.  While Defendant appears to argue that police improperly searched the kitchen closet area during the protective sweep, (Mem. in Supp. of Mot. to Suppress at 11-12), the testimony from all the witnesses at the hearing was consistent in explaining that the search of that closet occurred only after Mr. Johnsrud had been awaken by the officers and, as explained below, after he had provided consent for them to search the closet.  These are separate and distinct events for purposes of the search.  See <u>United States v. Cantrell</u>, 530 F.3d 684, 691 (8th Cir. 2008) ("[The defendant] completely fails to distinguish between the initial entry into the [] home to effectuate his arrest; the protective sweep immediately following his arrest, and the subsequent full-scale search of the [] home based on [the owner's] consent.").

contact with Mr. Johnsrud, for purposes of the issues now directly before the Court in this

motion, is not material.[6]

### B.  Law enforcement obtained consent to search the kitchen closet area

Once law enforcement officers were lawfully inside the apartment, before searching for

any evidence, they spoke with Mr. Johnsrud and, according to all the testimony, obtained consent

to search from Mr. Johnsrud.

"The Fourth Amendment permits . . . a valid warrantless search of a premises when

officers obtain the voluntary consent of an occupant who shares authority over the area in

common." United States v. Nichols, 574 F.3d 633, 636 (8th Cir. 2009) (citing United States v.

Matlock, 415 U.S. 164, 171 (1974)).  "In order for a consensual search to be valid, consent must

---

[6] While the Court need not decide which testimony it finds more credible, the Court has no real difficulty determining that SA Newhouse's testimony is more credible.  First, during his testimony at the motions hearing, Mr. Johnsrud couldn't even remember the address of the Bemidji Avenue apartment, a place he lived a mere two months prior to the hearing.  (Tr. 79).  Second, as explained in footnote two above, Mr. Johnsrud first testified that he remembered looking at his clock when Defendant Troy woke him up on December 12, 2012, but then contradicted himself by explaining that he didn't really know the exact timeline and that it was somewhere between 9:30 and 10:30 a.m.  Third, during his testimony at the hearing, Mr. Johnsrud testified that he had previously told an investigator from the Public Defender's Office that he was "sure that [he] was woken up by being shaken" by a deputy, at the time law enforcement had entered the apartment, but that he was no longer sure that was the case and that he did "not know how [he] was woken up"—indeed, at the hearing, he couldn't remember if he was woken up by the officer saying his name or the officer shaking him awake.  (Tr. 93).  Fourth, Mr. Johnsrud testified that he had a conversation with Co-Defendant Burns, while visiting him at the Bemidji jail, regarding how law enforcement came into the apartment the day of the search.  (Tr. 104-105).  SA Zavala also testified that in a recorded jail conversation between Co-Defendant Travis Burns and his mother, Sabrina Burns, Ms. Burns explained that she had previously spoken with Mr. Johnsrud regarding how the police entered the apartment.  (Tr. 110-11).  While Co-Defendant Burns objected to this testimony as improper hearsay, this Court on numerous occasions has explained that that "[t]he rules of evidence, except for rules about privilege, do not apply at suppression hearings."  United States v. Pickar, No. 08-116 (PJS/SRN), 2008 WL 5412363, at *1 n.1 (D. Minn. Dec. 23, 2008); see also United States v. Smith, No. 12-183 (SRN/AJB), 2012 WL 5497872, at *2 (D. Minn. Sept. 20, 2012) ("[H]earsay may be accepted at a suppression hearing so long as the court is persuaded that the statements were actually made and there is no cause for serious doubt about truthfulness."), adopted by 2012 WL 5497862 (D. Minn. Nov. 13, 2012).  There is no reason to doubt the veracity of SA Zavala's testimony.  Fifth, Mr. Johnsrud testified that he had previously been confronted by another individual and called a snitch for "inviting the police officers into [the] house," which was partially why he began to be concerned for his safety.  (Tr. 106-107).  Finally, and perhaps most importantly, Mr. Johnsrud testified that he is very close to Defendant Troy and Co-Defendant Burns, so much that he considers Co-Defendant Burns like a brother.  (Tr. 102-103).  All of these facts undermine the credibility of Mr. Johnsrud and seriously call into question Mr. Johnsrud's ability to accurately remember the events on the day of the search and his bias and interest toward Defendant Troy and Co-Defendant Burns, with whom he had a very close relationship for a long time.

actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so."  United States v. Williams, 521 F.3d 902, 906 (8th Cir. 2008). Defendant acknowledges that a third party with common authority may provide consent for a search and does not challenge Mr. Johnsrud's authority to consent or the voluntariness of the consent to a search of his bedroom, common areas in the apartment or even the door-less closet near the kitchen, but rather, Defendant argues that Mr. Johnsrud did not provide consent for SA Newhouse to search the kitchen closet area and the laundry basket within that area.  (Mem. in Supp. of Mot. at 13).  Specifically, Defendant argues that "Mr. Johnsrud told the officers that his roommates had property in the closet off the kitchen and reminded the officers that he did not give consent to search the property belonging to Mr. Burns or Mr. Troy."  (Id.)  In other words, Defendant argues that the search went beyond the scope of the consent given by Defendant.

In determining whether an individual consented, the question is not whether the person subjectively consented, but "whether his conduct would have caused a reasonable person to believe that he consented."  Williams, 521 F.3d at 906-07.  "The government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that on the totality of the circumstances the officer reasonably believed that the search was consensual."  United States v. Almendares, 397 F.3d 653, 660 (8th Cir. 2005).  As already noted, Defendant does not specifically challenge the voluntariness of Mr. Johnsrud's consent, but rather, the scope of that consent.

"The standard for measuring the scope of consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the individual?"  United States v. Adams, 346 F.3d 1165, 1171 (8th Cir. 2003).

The Court finds that it was objectively reasonable for officers to believe that Mr. Johnsrud provided consent to search the door-less closet in the kitchen area. There is no real dispute that the kitchen closet area is a common area of the apartment. Indeed, Mr. Johnsrud informed the officers, and testified at the motions hearing, that the closet jointly contained items that belonged to his roommates as well as items that belonged to him. (Tr. 33, 59-60, 63, 86) ("[Y]eah, it's a household closet. You know, it's just where we put all of our stuff that we don't need."). Additionally, SA Newhouse testified that Mr. Johnsrud knowingly provided consent for officers to search common areas of the apartment. (Tr. 32). Mr. Johnsrud himself testified at the motions hearing that he told the officers that they could "check [his] stuff." (Tr. 85). Furthermore, SA Newhouse testified that Mr. Johnsrud never made any objection to the officers' search efforts, even though Mr. Johnsrud was present during the initial search of the kitchen closet. (Tr. 34, 96). When asked at the motions hearing if he objected to officers searching the items in the closet that belonged to him, Mr. Johnsrud testified that he "didn't have a problem with it." (Tr. 96). Although Mr. Johnsrud had told the officers that he could not give permission to search items that did not belong to him, and although SA Newhouse moved a laundry basket in the kitchen closet, as already discussed, Mr. Johnsrud had provided consent to search the common area of the kitchen closet and had informed the officers that some of the things in the closet belonged to him. There is nothing in the record to indicate that SA Newhouse or any of the other officers knew, at the time SA Newhouse moved the laundry basket, that the laundry basket belonged to Defendant Troy instead of Mr. Johnsrud. To the contrary, immediately after moving the laundry basket and noticing a box of shotgun shells, SA Newhouse asked Mr. Johnsrud who the laundry basket belonged to. (Tr. 33-34). When he learned that the laundry basket belonged to Defendant Troy, SA Newhouse stopped the search. (Tr. 35).

Therefore, because Mr. Johnsrud provided consent for officers to search the common areas of the apartment (one of which was the kitchen closet), as well consent to search his "stuff" (some of which was stored in the kitchen closet), and because Mr. Johnsrud never indicated prior to SA Newhouse moving the laundry basket that the laundry basket belonged to Defendant Troy, it was entirely reasonable, and within the scope of consent, for the officers to search the area in the kitchen closet.  See United States v. Elam, 441 F.3d 601, 603 (8th Cir. 2006) (rejecting the defendant's argument that officers improperly relied on a roommate's consent without asking who owned a locked cabinet in a common closet and holding that it was reasonable for officers to search the locked cabinet in a common closet when they were given permission by one of the roommates of the home and they had no knowledge that the locked cabinet, in fact, belonged to another roommate); United States v. Kimoana, 383 F.3d 1215, 1223 (10th Cir. 2004) ("Consent to search for specific items includes consent to search those areas or containers that might reasonably contain those items."); Garnsey v. Miller, 2007 WL 2156646, at *4 (N.D. N.Y. Jul. 25, 2007) (explaining that once the owner of the home had given consent to search a common area to which she had mutual access and control, "the need [for] consent to search the duffle bag [belonging to the defendant] became immaterial").  Even though Mr. Johnsrud had indicated to the officers that he could not give permission to search items that did not belong to him, Defendant provides no authority, and the Court has found none, requiring police to preemptively ask an individual—who has already provided general consent to search a common area where the consenting individual has stored some of his items—for the identification of the owner of every single item within that closet.  This is not a case in which officers opened or searched a closed or locked container in a closet, which they knew belonged to someone other than the consenting individual.  Without any prior knowledge that the laundry basket belonged to someone other than

Mr. Johnsrud and without any other evidence to suggest that officers consciously went beyond the scope of consent, the Court finds that a reasonable officer would not have believed that moving the laundry basket exceeded the scope of consent. Moreover, it was reasonable for SA Newhouse to believe that he had authority to move the laundry basket because Mr. Johnsrud apparently observed the search of the kitchen closet and never made any objection during SA Newhouse's search. See United States v. Ruiz, 412 F.3d 871, 880 (8th Cir. 2005) (explaining that "failing to object to the continuation of a consent search makes the continued search objectively reasonable"); United States v. Alcantar, 271 F.3d 731, 738 (8th Cir. 2001) (same); United States v. Jones, 356 F.3d 529, 534 (4th Cir. 2004) (explaining that a "suspect's failure to object (or withdraw his consent) when an officer exceeds limits allegedly set by the suspect is a strong indicator that the search was within the proper bounds of the consent search"); United States v. Mendoza-Gonzalez, 318 F.3d 663, 670 (5th Cir. 2003) ("A failure to object to the breadth of the search is properly considered an indication that the search was within the scope of the initial consent.").

For these reasons, the Court finds that law enforcement did not violate Defendant's Fourth Amendment rights in entering the apartment to perform a protective sweep and then searching the kitchen closet common area pursuant to Mr. Johnsrud's consent.[7]

---

[7] In his improperly filed reply, Defendant argued that "even if [Mr. Johnsrud] had given consent, [his] "consent" was a direct fruit of the officer's illegal entry into the apartment." (See Def.'s Reply at 4). Because the Court has already found that the entry into the apartment to perform the protective sweep was lawful, it need not further discuss Defendant's argument that the consent was the fruit of the alleged unlawful entry. Even if it were, however, it would not necessarily require suppression. See United States v. Calhoun, 49 F.3d 231, 234 (6th Cir. 1995) (finding that a pre-arranged protective sweep was improper where police had no specific, reasonable basis for believing that they were in danger from person inside the residence but finding that the subsequent consent to search the residence was nonetheless proper "because the sweep did not yield incriminating evidence").

### C.  The search warrant is supported by probable cause even without the evidence from the initial consent search

Defendant argues that "[t]he majority of the search warrant affidavit was based on information obtained as a result of the unlawful intrusion into the apartment [and w]hen the information obtain[ed] by the officers pursuant to the illegal search of the apartment is removed from the affidavit, what remains falls short of the probable cause needed to support a search warrant for the apartment."  (Mem. in Supp. of Mot. to Suppress at 15).[8]

The Eighth Circuit has previously explained the proper analysis when a search warrant was issued based upon an affidavit containing evidence from an initial, unlawful entry by police:

> A warrant obtained after an illegal search is not an independent source if either of the following are true: "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry," and "if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray,* 487 U.S. at 542, 108 S. Ct. 2529. In other words, *Murray* asks the following two questions, both of which must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them.

United States v. Swope, 542 F.3d 609, 613-14 (8th Cir. 2008), cert. denied, 555 U.S. 1145 (2009).

The Court answers the first question in this inquiry, "whether the police would have applied for the warrant had they not made the prior illegal observations," Swope, 542 F.3d at 615, in the affirmative.  Defendant makes no argument to the contrary.  First, SA Newhouse testified that he had informed Mr. Johnsrud that he could refuse consent to search the apartment, upon which SA Newhouse could seek a search warrant, thereby demonstrating law

---

[8] Because the Court finds that the initial consent search of the Bemidji Avenue apartment was not invalid, the Court could dispense with addressing this last argument of Defendant.  However, in the interest of completeness, the Court will consider the argument if only to explain its lack of merit on the present record.

enforcement's independent readiness to apply for a search warrant. Additionally, the record demonstrates that police were actively investigating the armed bank robbery, and, given the numerous facts more fully described below which demonstrate probable cause to search the Bemidji Avenue apartment, even prior to the initial warrantless search of the apartment, officers would have undoubtedly been interested in searching the apartment and "nevertheless would have been prompted to apply for the search warrant based on the other information that they had." Swope, 542 F.3d at 615.

The Court answers the second question in the affirmative as well: the redacted application, excluding the references to evidence obtained as a result of the entry into the apartment and the initial consent search of the kitchen closet, supports probable cause. Id. at 616.

As previously explained by the Eighth Circuit, "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause." United States v. Parker, 836 F.2d 1080, 1083 (8th Cir. 1987). Probable cause exists when "a practical, common-sense" evaluation of "all the circumstances set forth in the affidavit," demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Gates, 462 U.S. at 231). "The existence of probable cause depends on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (internal quotation marks omitted).

Here, the search warrant application affidavit completed by Investigator Jake Hodapp provided that the First State Bank of Big Fork was robbed by someone wearing a Tyvek suit and a white "Michael Myers" type Halloween mask. (Gov't Ex. 9 at 0000243). The day after the robbery, police had received a report from an individual who purported to be a prior foster care provider to Defendant. (Id.) The individual informed law enforcement that he knew Defendant had previously possessed a Michael Myers type mask and that Defendant had previously "used [it] to try to scare him." (Id.) The individual also believed that Defendant had access to Tyvek-type protective clothing because Defendant's stepfather was involved in the construction trade. (Id.) The individual further informed law enforcement that Defendant had a criminal history, which included recent crimes related to burglary. (Id.) Officers, indeed, confirmed that Defendant had an outstanding warrant related to a 2nd Degree Burglary charge. (Id.) Finally, the affidavit provided that prior to entering the Bemidji Avenue apartment, Defendant Troy emerged from the apartment and was arrested on the outstanding warrant. (Id.) These facts not only provide a tip from an informant, which was partially corroborated by police, and demonstrate a connection between Defendant and the scene of the crime, but also provide a connection between Defendant and the Bemidji Avenue apartment.

Furthermore, Investigator Hodapp included numerous independent facts establishing a connection between Co-Defendant Burns, the Bemidji Avenue apartment, and the scene of the crime. Specifically, the day after the robbery, law enforcement received a tip from a witness that had seen a smaller, red truck travelling away from the city of Kelliher on the day of the robbery, which the witness believed was being driven by one of the Burns' brothers. (Id.) On the day of the search of the Bemidji Avenue apartment, and prior to the arrest of Defendant Troy, law enforcement had observed a Mazda truck registered to Michael Burns, the father of Co-

Defendant Burns, parked outside of the apartment, and the truck tires had treads that matched the photographs and measurements of the tire treads observed at the scene of the robbery.  (Id. at 00000244).

This independent evidence collectively demonstrates connections between two individuals, the scene of the crime, and the Bemidji Avenue apartment.  Therefore, even based upon all of these facts alone, there was a substantial basis for a judicial officer to conclude that there was a fair probability that contraband or evidence of the armed bank robbery would be found at the Bemidji Avenue apartment.  See Swope, 542 F.3d at 616 (finding that the search warrant was supported by probable cause, even though "much of the application was tainted").

## III.    CONCLUSION

1.      Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that Defendant's motion to suppress evidence [Docket No. 41] be denied.


Dated: April 11, 2013                                              s/Leo I. Brisbois_____
                                                                          LEO I. BRISBOIS
                                                                          United States Magistrate Judge


# N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by April 25, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.